WINDOM, Presiding Judge.
Michael Wayne Reynolds appeals the circuit court's summary dismissal of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P., in which he attacked his October 2007 convictions on five counts of capital murder. See §§ 13A-5-40(a)(2), 13A-5-40(a)(10), and 13A-5-40(a)(15), Ala.Code 1975. By a vote of 12-0, the jury recommended that Reynolds be sentenced to death. The circuit court accepted the jury's recommendation and sentenced Reynolds to death for each of the five capital-murder convictions.
On October 1, 2010, this Court affirmed Reynolds's convictions and sentences of death. Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010). On December 14, 2012, the Alabama Supreme Court denied his petition for writ of certiorari and issued a certificate of judgment. Id. On October 7, 2013, the Supreme Court of the United States denied Reynolds's petition for a writ of certiorari. Reynolds v. Alabama, 571 U.S. 843, 134 S.Ct. 97, 187 L.Ed.2d 72 (2013).
On December 10, 2013, Reynolds, through counsel, filed his Rule 32 petition, in which he raised numerous claims of ineffective assistance of counsel in both the guilt and penalty phases of his trial and argued that the State withheld evidence favorable to the defense, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). On March 21, 2014, Reynolds filed an amended petition reasserting his existing claims and raising additional claims of ineffective assistance of counsel in both the guilt and penalty phases of his trial.
On May 5, 2014, the State filed a motion to dismiss in which it argued that Reynolds's claims were insufficiently pleaded under Rules 32.3 and 32.6(b), Ala. R.Crim. P., procedurally barred under Rules 32.2(a)(3), 32.2(a)(4), and 32.2(a)(5), Ala. R.Crim. P., and/or without merit. On May 22, 2014, Reynolds filed a response to the State's motion to dismiss. On August 20, 2014, the circuit court issued an order dismissing Reynolds's petition. On September 12, 2014, Reynolds filed a postjudgment motion challenging the circuit court's order of dismissal.
In this Court's opinion on direct appeal, it set out the following facts surrounding Reynolds's convictions:
"The State presented evidence that in the early morning hours of Sunday, May 25, 2003, Charles Martin III, his wife, Melinda, and their 8-year-old daughter, Savannah, were stabbed to death in their house. Their bodies were doused with gasoline and set on fire. The *191 crimes were discovered later that morning by Melinda's father, Jerry Veal. Melinda Martin's purse and a cordless telephone were missing from the house.
"Adrian Marcella 'Marcie' West, who was Michael Reynolds's girlfriend at the time of the murders, testified at trial. She and Reynolds lived with Reynolds's father, Harold Reynolds, at the time of the crimes. West testified that on Saturday, May 24, 2003, Michael Reynolds installed a car stereo for Donald Harvey, who was also known as 'Dino,' in exchange for some cocaine. West and Reynolds used the cocaine; they also used crack cocaine several more times throughout that day and night.
"West testified that later that night or early on Sunday morning, she drove Michael Reynolds to the Martins' house in a vehicle that was owned by Harold Reynolds's girlfriend, Sandra Roberts. West said that Michael Reynolds and Charles Martin were good friends. Reynolds told West that they were going to the Martins' house 'to get some money,' and she assumed he meant that he was going to rob Charles Martin.
"When they arrived at the Martin residence, West parked the vehicle in the driveway, and Michael Reynolds got out. Reynolds told West to wait in the car. West said that Reynolds was not wearing any shoes, and that he was carrying a scabbard containing a dagger-style knife. She had seen the knife before at Harold Reynolds's residence. West testified that she was not alarmed that Reynolds had the knife with him because, she said, Reynolds sometimes traded various items for drugs or money.
"Reynolds went to the carport door and knocked. Charles Martin opened the door and waved at West, and then Martin and Reynolds went into the house.
"While West was waiting in the car, she heard Melinda Martin scream. West got out of the car and ran into the house. She saw Charles Martin lying on the kitchen floor and she heard Melinda Martin screaming in the back of the house. West went to the bedroom, where she saw Melinda Martin bent over next to the bed as Michael Reynolds stabbed her. Savannah Martin was on the bed.
"West testified that she got between Reynolds and Melinda and tried to stop him from stabbing her. Reynolds accidentally stabbed West through the arm when she tried to intervene. West testified that Reynolds yelled at her and asked her what she was doing there. He told West to get the telephone and Melinda Martin's purse and to go wait in the car. Reynolds handed her two knives-the knife that he had taken into the house, and a steak knife that West had not seen before.
"West grabbed the telephone and Melinda Martin's purse, and took the knives and left the bedroom. When she left the room, Melinda Martin was 'slouched over' at the end of the bed, and Savannah Martin was standing on the bed. West testified that she felt faint, so she leaned up against the wall in the hallway. She again felt faint when she crossed over Charles Martin's body in the kitchen, so she leaned against the kitchen counter. West left the house and went to the car.
"West opened the front passenger door and placed the items in the floorboard and then crawled to the driver's side of the vehicle-the driver's door was damaged and did not open.
"West testified that Reynolds came to the car and told West not to leave, and *192 then he grabbed the larger knife and went back into the house. Reynolds apparently returned to the car a second time and again told West not to leave. West testified that she was afraid, so she did not leave or call for help. At that time, West did not realize that she had been stabbed.
"West testified that when Reynolds returned to the car for the third time, he got in the vehicle and told her that she had been stabbed and that he should drive. West said that she did not allow Reynolds to drive because she feared that he was going to take her somewhere and kill her. West could see the orange glow of a fire in the house.
"She drove back to Harold Reynolds's residence. When they arrived at Reynolds's house, Michael Reynolds told West to give her clothes to him and to take a shower. West stated that she saw Reynolds looking through Melinda Martin's purse. While West was taking a shower, Reynolds took a cloth and cleaned Sandra Roberts's car. After West showered, Reynolds bandaged her arm, using a first-aid kit they had in their bedroom. Reynolds told West that there was no blood in the car.
"Sandra Roberts testified that she was asleep in Harold Reynolds's bed when West and Michael Reynolds arrived back at the house. She testified that around 3:00 or 4:00 a.m. she was awakened when Reynolds placed her car keys on the night stand beside the bed. West and Reynolds then went to their bedroom. Roberts noticed that West was walking with her arms folded.
"Roberts got out of the bed and went into the kitchen and sat down at the kitchen table. A short time later, Michael Reynolds entered the kitchen and gave Roberts some money and told her to go buy some drugs. Roberts left and purchased some crack cocaine. West said that while Roberts was gone, Michael Reynolds took a shower and that is when she noticed blood on Reynolds's legs.
"When Roberts returned to the house, she and Michael Reynolds divided the crack cocaine. Roberts used her portion of the drugs while she was seated at the kitchen table, but Michael Reynolds took his and West's share of the crack to his bedroom.
"Roberts testified that a short time later, Michael Reynolds reentered the kitchen and propositioned her for sex, but she refused. Roberts said that Michael Reynolds wanted more drugs but, according to him, he could not get West to give him more money. Reynolds asked Roberts to talk to West. Roberts agreed.
"When Roberts entered the bedroom, West was in the bed with the covers pulled up to her neck, staring at the ceiling. Roberts testified that West was acting strangely and that she was unable to engage West in any conversation. Roberts decided to leave and go to her house. As she was driving, she noticed a cordless telephone without the base on the backseat of her car. Roberts had never seen that telephone before.
"West and Michael Reynolds woke around 9:00 or 9:30 on that morning. West noticed that the eyeglasses Michael Reynolds had been wearing the night before were broken. When she pointed this out to Reynolds, he told her that the missing eyeglass piece would melt in the fire. West testified that Reynolds told her that the knives were under the truck and that their clothes and Melinda Martin's purse were in a white bag.
"Around 10:00 a.m. on Sunday May 25, Jerry Veal, Melinda Martin's father, *193 drove by Charles and Melinda Martin's residence located on Tidmore Bend Road in Etowah County. Veal became concerned when he saw Melinda's vehicle parked in the driveway because Melinda regularly attended church services on Sunday mornings. Veal telephoned Melinda on his cell phone, but no one answered.
"Veal drove back to the Martin residence and parked his vehicle in the driveway. He got out and went to the carport door and knocked. When no one came to the door, Veal opened the carport door and found the kitchen in disarray-furniture had been moved around, the window treatments were partially torn down, and there was blood everywhere. Veal saw his son-in-law lying on the kitchen floor in a pool of blood.
"Veal returned to his car and told his wife, and she telephoned 911. While Jerry Veal was talking on the cell phone with the 911 dispatcher, he saw James Mulkey, a retired Gadsden police officer, drive by the house. Veal was acquainted with Mulkey, so he stopped Mulkey and told him what he had seen.
"Mulkey instructed Veal to remain outside, and Mulkey went to the carport door. When Mulkey opened the carport door, he saw Charles Martin, who appeared to be dead, lying on the kitchen floor. Mulkey did not enter the residence at that time because he could detect the strong odor of gasoline and gunpowder.
"When the paramedics arrived, Mulkey and the paramedics entered the residence; they determined that Charles Martin was dead. Mulkey and the paramedics proceeded down the hallway to determine if anyone was in need of medical assistance. They discovered the bodies of Melinda Martin and Savannah Martin in a bedroom. The bedroom was in disarray and there was blood everywhere.
"The smell of gasoline was overpowering, so Mulkey opened the back door to the residence, and then he and the paramedics left through the back door of the house, being careful not to disturb the scene.
"Investigators arrived and processed the scene. During the investigation, a bloody partial footprint and a blood drop were discovered on the steps outside the carport door. Charles Martin was found lying on the floor in a pool of blood with a cigarette by his mouth. There were three bloody shoe prints on the kitchen floor. The kitchen chairs were knocked over, the kitchen blinds had been ripped or slashed, and there was blood spattered everywhere. A gasoline can was sitting on the floor beside Charles Martin's body, and exploded bottle rockets were scattered throughout the kitchen and into the living room.
"A utensil drawer in the kitchen was open, and there were blood droplets under the drawer. There were two sandwiches on a Styrofoam plate on the kitchen counter by the stove, and one of the burners of the kitchen stove was lit. Investigators observed a spoon with gray material in it and a syringe located on the counter beside the stove. A basket of prescription drugs was also on the counter.
"Blood droplets were found on the hallway wall opposite the door to the bedroom where the bodies of Melinda and Savannah were discovered.
"Melinda Martin was found lying on the floor on the right side of the foot of the bed. She had slits in her clothing that were consistent with stab wounds. She was also wearing a back brace. A walking cane was found near her body.
*194 A telephone cord extended from the wall by the headboard of the bed to Melinda Martin's body, but no telephone was attached to the cord.
"Savannah Martin was lying on her back on the bed. She had been stabbed multiple times and had a prominent stab wound through her neck. A bloody hand print was discovered near Savannah's body on the fitted sheet; however, due to the soft surface, there was no ridge detail to the print.
"An investigator collected the wet, bloody comforter and bed linens and put them in a large paper bag in order to transport the bedding to the forensic laboratory for further testing. When the bedding was unpackaged and put up to dry later that day, a television remote and a temple piece to a pair of eyeglasses fell out of the bedding. Law-enforcement personnel were informed about the eyeglass piece.
"An autopsy of the victims confirmed that Melinda Martin died as a result of 24 stab wounds to her body. Charles Martin died as a result of 11 stab wounds to his body. Savannah Martin died as a result of 5 stab wounds to her body. All the victims had chemical burns to their bodies, and Chuck Martin also had thermal burns on his body. None of the stab wounds to the victims was immediately fatal.
"West testified that as she and Reynolds were walking to a nearby convenience store later that same Sunday morning, Reynolds asked West if he had made the headlines, and he inquired whether West had seen Charles Martin's face. Later that day, the police arrested Michael Reynolds on an unrelated matter.
"That same afternoon, West saw Donald Harvey drive into the alley behind Reynolds's residence. West got into Harvey's car, and he asked her if Reynolds had anything to do with what happened to Charles Martin. West nodded in the affirmative. Although the evidence was conflicting regarding whose idea it was, West and Harvey agreed that they should get rid of the evidence from the crime scene.
"Harvey and West went to a gasoline service station and purchased some gasoline and drove to an area near Tuscaloosa Avenue. West threw the telephone base into the woods, and then Harvey doused the bag containing their clothes and the purse with gasoline and set the items on fire. West and Harvey threw the knives into the Coosa River from a pier at a boat launch located at Gadsden State Junior College.
"On the day the murders were discovered and in the days that followed, the police questioned several persons regarding their potential involvement in the murders and robbery, including Charles Martin's nephew, Chad Martin, and John Langley, who lived in the same neighborhood as the Martin family. The police ultimately ruled these individuals out as suspects.
"A few days after the discovery of the crimes, West talked with her former employer, who was an attorney, and told him what had happened. The attorney contacted the district attorney's office, and as a result, West subsequently gave the police a statement regarding the crimes.
"Based on the information provided by West, the Gadsden police located and photographed the burn pile where West said the clothes and purse had been burned, and the police also recovered the telephone base in the woods a short distance from the burn pile. The phone base, the cordless phone found in Roberts's car, and the telephone cord lying *195 across the floor in the room where the bodies of Melinda and Savannah Martin were found were all Uniden brand products.
"Gadsden police conducted a search of Harold Reynolds's residence. In the bedroom shared by Michael Reynolds and West, the police discovered a pair of prescription tinted eyeglasses. The glasses were broken-the temple piece was missing, and one of the lenses was lying beside the glasses. The glasses were consistent with the prescription lenses and frames sold to Reynolds by a professional optician. The temple piece recovered from the bedding at the Martin house matched the temple piece still attached to the frame found at the Reynolds residence. A first-aid kit was also discovered in the bedroom.
"A scuba diver with the Etowah County Rescue Squad recovered an oriental-style scabbard from the Coosa River in the area where the knives had been discarded by West and Harvey. Sandra Roberts testified that the scabbard appeared to be the same scabbard she had previously seen at Reynolds's residence. West also testified that the scabbard was the one that she and Harvey had disposed of in the Coosa River.
"Photographs of Michael Reynolds's hands taken by the Gadsden police after his arrest showed bruising and flaking skin. West testified the bruising and flaking was not present at the time of the murders.
"A forensic examination of the interior of Roberts's car did not indicate the presence of any blood. Forensic testing of the DNA extracted from the swab of the blood drop from the outside steps and the hallway at the Martin residence matched the DNA obtained from Adrian West. There was a mixture of DNA on the blood swabbed from the handle of the gasoline can. The primary contributor of that DNA was determined to be Savannah Martin, but neither Michael Reynolds nor Melinda Martin could be excluded as a contributor of the DNA. There was also a mixture of DNA from a swab of blood obtained from the lens of Michael Reynolds's glasses-Melinda Martin's DNA was the primary component of that DNA mixture. The bloody footprint on the outside door-step matched a known ink print of Michael Reynolds's footprint.
"The shoe prints in the kitchen did not match any of the known samples submitted for comparison purposes, and a blood swab from the outside door frame did not match any of the known DNA samples."
"Michael Reynolds testified in his defense. He testified that he met Charles Martin in May 2002 and that he and Charles became good friends. Reynolds testified that Martin was one of the people authorized to take Reynolds's son home from school. Reynolds and his son even lived with Charles Martin for several months, at Martin's mother's residence.
"Reynolds said that he saw Martin several times a week up until the time Reynolds was arrested for a different offense. Reynolds testified that he had seen Melinda Martin a couple of times, but that he had never seen Savannah Martin. He testified that the last time he saw Martin alive was two or three weeks before the Martins were killed.
"Reynolds testified that at the time of the incident, he and Adrian West were living with his father at his father's residence. Reynolds said that on the morning of Saturday May 24, 2003, his 'boss' came by the residence and paid his father and him for a painting job they had completed the day before. Later that *196 morning, Donald Harvey came to the Reynolds residence and asked Michael Reynolds to install a car radio for him. Reynolds said that he installed the radio, and Harvey gave him a gram of cocaine in return.
"Reynolds said that between 9:00 and 10:00 p.m., Sandra Roberts came to the residence. Reynolds and West shared the last of their drugs with Roberts. Reynolds testified that he gave Roberts some money to get some more drugs. Reynolds explained that he had money to purchase the drugs because in addition to the money that he had received that morning for completing the painting job, West also had $500 that Reynolds's father had given her to hold in case Reynolds needed to post bond-he testified that there was an outstanding warrant for his arrest at that time.
"Reynolds testified that Sandra Roberts left and went to buy more drugs. When she returned with the drugs, Reynolds, Roberts, and West used all of those drugs. Reynolds testified that some time later, Adrian West and Sandra Roberts left together in Sandra's car to go get more drugs. Reynolds testified that he instructed West to go with Roberts because he thought Roberts had cheated them out of drugs on the previous transaction.
"Reynolds testified that after Roberts and West had been gone for a couple of hours, he changed into a pair of shorts and a T-shirt, went to bed, and fell asleep. His father was passed out; he was intoxicated.
"Reynolds said that some time later, Adrian West woke him and told him that she was hurt. Reynolds got out of bed to attend to West. When Reynolds asked her how she was hurt, she told him that she had been stabbed. Reynolds then asked West how she had been stabbed, and she responded that 'Chuck was dead and she ... got stabbed trying to stop them from stabbing Chuck's wife.' (Vol.XI, R. 1567.) Reynolds testified that West did not tell him who she was with at the time of the stabbings.
"Reynolds stated that he was concerned about her arm, so he bandaged it using a first-aid kit he had in the bedroom. He said that the wound was not bleeding very much but that it looked bad. After bandaging her arm, Reynolds instructed West to accompany him outside the house so that he could talk to her without fear of his father overhearing.
"Reynolds testified that when they got outside, he continued to question her about what happened, but West did not want to talk about it. Reynolds said that West was very worried, so he told her to get Sandra Roberts's car keys and she did.
"Reynolds said that they left in Roberts's car, and that West drove because Reynolds's license had been revoked. Reynolds was still dressed in the clothes he had on when he went to sleep, and, although he put on his glasses, he did not put on any shoes.
"They went to the Martin residence. He said that when they got to the residence, West slowed down in order to pull in the driveway; however, Reynolds said that because the lights were on in the house, he instructed her to keep driving. West drove to a nearby gas station, turned around, and then drove back to the Martin residence.
"When they got to the Martin residence, West asked Reynolds what he wanted her to do. He testified that he again instructed her to 'just drive.' (Vol.XI, R. 1571.) West began to drive back to Reynolds's residence. Reynolds testified that as they were traveling, *197 West told him that she was scared, and she asked him what they were going to do. Reynolds said that as they neared his father's residence, he 'just knew [he] had to do something,' so he instructed West to again drive to the Martin residence. (Vol.XI, R. 1571.)
"Reynolds testified that when they arrived at the Martin residence that time, West drove the car into the driveway. The carport light was on. Reynolds got out of the car and told West to remain in the car. As Reynolds approached the carport door, he saw that the door was cracked open. Reynolds pushed the door open and saw Charles Martin lying on the floor. Reynolds said there was blood all around Martin so, he said, he knew at that point that West had told him the truth.
"He testified that he did not telephone the police; instead, he went inside, stepped over Charles Martin's body, and went to the Martins' bedroom. He explained that he went to that bedroom because West told him she had been hurt 'trying to stop them from stabbing Chuck's wife.' (Vol.XI, R. 1573.) Reynolds said that although the television was on in the bedroom, the bedroom lights were not on, so he did not see Melinda Martin's body when he first went into the room. Reynolds said that he tripped over Melinda Martin, who was lying in the floor between the bed and the doorway. When he tripped, his glasses fell off onto the bed, and he caught himself on the bed. Reynolds testified that he grabbed his glasses from the bed and stood up and that is when he saw Melinda Martin, who appeared to be dead. Reynolds testified that he never saw Savannah Martin.
"Reynolds said that he went back through the house and outside, stepping back over Charles Martin in the process. He gave West his glasses and told her to hold them. Reynolds then asked West to tell him everything that she had touched so that he could wipe it off, but West could not recall everything she had touched. Reynolds testified that he went back into the house, intent on wiping the surfaces off. Reynolds said that everything in the house was such a mess that he did not know where to start. He said that at that point, he looked and saw that one of the burners on the stove was lit, so he decided to burn the house down. Reynolds testified that he got the gasoline can that was located beside the porch steps, and doused the rooms with gasoline.
"Reynolds said that when he got back to the kitchen, he got a napkin and lit it from the burner, and threw it on the gasoline trail. Reynolds then left the house and got in the car and told West to leave. As West drove back toward Harold Reynolds's residence, she asked Reynolds what was going to happen and he told her '[N]othing, I caught the place on fire.' (Vol.XI, R. 1576.)
"Reynolds testified that when they got back to Harold Reynolds's residence, they parked Sandra's car and went into the house. As they walked by his father's bedroom, Sandra Roberts asked them if they had 'anything,' meaning drugs. Reynolds told her they did not, and then he and West went to the bedroom they shared. Reynolds testified that at that point, he told West to give him some money and West gave him $20. He gave that money to Sandra Roberts and told her to go get some more drugs. He testified that he wanted to get Roberts out of the house. Reynolds said that he and West went into the bathroom, and he cleaned and rewrapped the injury on West's arm. In a few minutes, Roberts returned with more drugs.
*198 "When Roberts returned with the drugs, Reynolds went into the kitchen and he and Roberts took some of the drugs. Reynolds prepared a syringe of the drugs for West and took it into their bedroom; however, West refused the drugs, saying she just wanted to go to sleep. Reynolds offered the drugs to Roberts, and when she declined to take the drugs, Reynolds used them. He then went back to sleep.
"Reynolds testified that later that morning while he and West were walking home from the convenience store, he again tried to question West about what had happened the night before. Reynolds said that West was acting strangely and that she told him that she did not want to think about it. He testified that at that point, he did not want to think about it either.
"Reynolds said that shortly after they arrived back at his father's residence, the police arrived and arrested him and that he had been incarcerated since that time."
Reynolds, 114 So.3d at 73-81 (footnote omitted).
Standard of Review
"The sufficiency of pleadings in a Rule 32 petition is a question of law. 'The standard of review for pure questions of law in criminal cases is de novo. Ex parte Key, 890 So.2d 1056, 1059 (Ala.2003).' " Ex parte Beckworth, 190 So.3d 571, 573 (Ala.2013) (quoting Ex parte Lamb, 113 So.3d 686, 689 (Ala.2011) ).
Analysis
On appeal, Reynolds argues, among other things, that the circuit court erroneously dismissed his claim that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by suppressing evidence indicating that Adrian Marcella "Marcie" West testified against Reynolds pursuant to a deal in which she would receive favorable treatment on charges pending against her. Specifically, Reynolds argues that the circuit court erroneously found that this claim was procedurally barred under Rules 32.2(a)(3) and (a)(5), Ala. R.Crim. P., because it could have been, but was not, raised at trial and on appeal. He also argues that the circuit court erroneously found that this claim was insufficiently pleaded under Rules 32.3 and 32.6(b), Ala. R.Crim. P. Reynolds contends that because this claim was not procedurally barred and was sufficiently pleaded, he was entitled to an opportunity to prove it at an evidentiary hearing.
In his amended Rule 32 petition, Reynolds detailed West's testimony against him. He also detailed his defense, i.e., that he went to the crime scene to destroy evidence of West's involvement in the murders. He later alleged the following:
"The State in this case withheld information about a deal made with Marcie West in return for her testimony. At the time of Mr. Reynolds' arrest and trial, Marcie West had several criminal charges pending against her. On August 6, 2002, West was arrested for unlawful distribution of a controlled substance-hydrocodone, unlawful possession of marijuana in the second degree and unlawful possession of drug paraphernalia. A few days after Mr. Reynolds' arrest, on June 3, 2003, West was arrested for unlawful distribution of a controlled substance-hydrocodone and hindering prosecution in the first degree.
"West faced significant jail time for these offenses. Unlawful distribution of a controlled substance is a class B felony *199 punishable by up to twenty years of imprisonment. Ala.Code [1975,] §§ 13A-5-6, 13A-12-211. Hindering prosecution in the first degree is a class C felony punishable by up to ten years of imprisonment. Id. §§ 13A-5-6, 13A-10-43. Unlawful possession of marijuana in the second degree and unlawful possession of drug paraphernalia are class A misdemeanors punishable by one year of imprisonment. Id. §§ 13A-5-7, 13A-12-214, 13A-12-260.
"Notably, although West was arrested for three drug offenses on August 6, 2002, charges were not filed in those cases until June 4, 2003, just days after the crime in this case occurred. After hiding for several days, West went to the police and signed an advice of rights form on May 28, 2003. (C. 495-96.) West's actual statement to the police is undated. (C. 497-99.) The drug charges were filed a week later to secure West's testimony at trial.
"On April 26, 2005, trial counsel filed a motion to require the prosecution to make known any incentives or agreements they had made with any witness who would give testimony in the case, and to disclose the record of all state witnesses. (C. 42-44.) On May 3, 2005, trial counsel filed a motion for discovery of prosecution files, records, and information necessary to a fair trial. (C. 54-62.) On May 10, 2005, the trial court granted both motions. (C. 64-65.) The State did not, however, disclose any facts relating to consideration offered to Marcie West in return for her testimony. At trial, West testified that she had received no deals from the State in return for her testimony. (R. 1011.) The State did not correct this false testimony.
"After West testified at trial, the State dismissed three of the pending drug charges against her. West pleaded guilty to one charge of distribution of a controlled substance and the charge of hindering prosecution. She was sentenced to three years' imprisonment for both. However, six months into her sentence, the State recommended that the balance of her sentence be suspended and she be placed on probation. After the State made this recommendation, West was immediately released from jail.
"Marcie West was the State's key witness against Mr. Reynolds. Her testimony was the only direct evidence presented by the State that Mr. Reynolds was the perpetrator of the murders rather than (as he testified) just another person present at the scene. The credibility of a key witness is 'an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to [that witness's] credibility and the jury was entitled to know of it.' Giglio [v. United States ], 405 U.S. [150,] 154-55 [ (1972) ]. The State's withholding of this evidence therefore violated Brady and Alabama law. 373 U.S. at 87 ; Savage v. State, 600 So.2d 405, 408 (Ala.Crim.App.1992) (reversing for State's failure to disclose prior statements by two witnesses because the 'failure of the State to supply the information directed the defense away from challenging the testimony of two key witnesses')."
(C. 216-17.)
In its motion to dismiss, the State argued that Reynolds's Brady claim relating to West was procedurally barred under Rules 32.2(a)(3) and (a)(5), Ala. R.Crim. P., because it was based on testimony elicited from West at trial-defense counsel asked West whether she had been offered a deal and she denied that any deal had been offered to her. The State also argued that *200 Reynolds's claim was insufficiently pleaded under Rules 32.3 and 32.6(b), Ala. R.Crim. P., because Reynolds "failed to plead any specific facts, other than pure speculation, that, if true, would establish that a deal actually existed between the prosecution and Marcie West or that West's testimony was false." (C. 310.) In response to the State's motion to dismiss, Reynolds asserted that his Brady claim was not procedurally barred because the facts underlying it were unknown to him and, thus, could not have been raised at trial or on appeal. Specifically, Reynolds argued:
"The earliest indication of the State's undisclosed deal, agreement or understanding with Marcie West was the State's recommendation that the balance of Ms. West's sentence be suspended after she pleaded guilty to distribution of a controlled substance and hindering prosecution. This recommendation occurred on November, 24, 2009, a full six months after Mr. Reynolds' appellate attorneys filed their reply brief in support of his appeal.... Similarly, the State's argument that 'there is no reason this claim could not have been raised at trial' because it is based on West's trial testimony (State's Motion at 88), is just as illogical and unsound. At the trial stage, Ms. West denied the existence of an agreement with the State and the State likewise disavowed such a deal and affirmatively represented that all Brady material had been provided to the defense. (C. 133, R. 121.) The State cannot now rely on the successful suppression or [denial] of an agreement with Ms. West at trial to prevent Mr. Reynolds from bringing a Brady claim in the current proceedings...."
(C. 322-23.) Reynolds also asserted that he had pleaded his Brady claim with sufficient factual specificity to satisfy the requirements of Rules 32.3 and 32.6(b), Ala. R.Crim. P. The circuit court agreed with the State and dismissed Reynolds's claim on the grounds that it was procedurally barred under Rules 32.2(a)(3) and (a)(5), Ala. R.Crim. P., and that it was insufficiently pleaded under Rules 32.3 and 32.6(b), Ala. R.Crim. P.
Rule 32.3, Ala. R.Crim. P., provides:
"The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."
Further, Rule 32.6(b), Ala. R.Crim. P., provides:
"Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."
This Court has stated the following concerning the scope of Rule 32.6(b), Ala. R.Crim. P.:
" ' Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.' Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion'which, if true, entitle[s] the petitioner to relief.' Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in *201 Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts."
Boyd v. State, 913 So.2d 1113, 1125 (Ala.Crim.App.2003).
In Brady v. Maryland, the United States Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.
"A Brady violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant and (3) material to the issues at trial. Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990) ; Delap v. Dugger, 890 F.2d 285 (11th Cir.1989) ; United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983) ; Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The Supreme Court of the United States in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion by Blackmun, J.), defined the standard of materiality required to show a Brady violation as follows: 'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' See also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) ; Stano v. Dugger, 901 F.2d at 899 ; Delap v. Dugger, 890 F.2d at 299 ; Coral v. State, 628 So.2d 954 (Ala.Cr.App.1992) ; Thompson v. State, 581 So.2d 1216 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
"The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. United States v. Bagley; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ; Ex parte Womack [, 435 So.2d 766 (Ala.1983) ]. 'When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within the general rule.' Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness."
Williams v. State, 710 So.2d 1276, 1296-97 (Ala.Crim.App.1996).
Thus, to sufficiently plead a Bradyem>/Giglio claim, a petition must allege facts that, if true, would establish that the prosecution suppressed evidence that was favorable to the defendant and material. Cf. Rule 32.6(b), Ala. R.Crim. P.; Williams, 710 So.2d at 1296-97. Additionally, "a Rule 32 petitioner has no burden to plead facts in his or her petition negating the preclusions in Rules 32.2(a)(3) and (a)(5) in order to sufficiently plead a [Brady ] claim...." Mashburn v. State, 148 So.3d 1094, 1119 n. 5 (Ala.Crim.App.2013) (citing Ex parte Beckworth, 190 So.3d 571, ---- (Ala.2013) ). Rather, the State has the burden to plead any ground of preclusion it believes applies to bar review of a Brady claim. Ex parte Beckworth, 190 So.3d at 574. However, once the State has pleaded a ground of preclusion, that ground is presumed to apply until the petitioner meets *202 his "burden of disproving its existence by a preponderance of the evidence." Rule 32.3, Ala. R.Crim. P.
In his petition, Reynolds pleaded facts that, if true, would establish that the State violated Brady and Giglio. Reynolds detailed the importance of West's testimony to the State's case. Reynolds alleged facts that, if proven, would establish that the jury's determination regarding his guilt depended on weighing West's credibility against Reynolds's credibility. The facts contained in Reynolds's petition, if true, would show that West testified pursuant to a deal with the State for favorable treatment on multiple pending charges. He also alleged facts indicating that the State failed to disclose West's deal to defense counsel and that it failed to correct West's testimony that there had been no deal. Thus, Reynolds alleged facts that, if true, would establish that the State suppressed evidence that was favorable to the defendant. Williams, 710 So.2d at 1296-97. He also alleged facts indicating that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Ex parte Belisle, 11 So.3d 323, 330-31 (Ala.2008).
Consequently, Reynolds has pleaded a facially meritorious claim that the State violated Brady and Giglio by failing to disclose that West testified pursuant to a deal in which she would receive favorable treatment on her pending charges in return for her testimony. Because Reynolds pleaded a facially meritorious Bradyem>/Giglio claim, he is entitled to an opportunity under Rule 32.9, Ala. R.Crim. P., to prove that claim. The State, however, pleaded that Reynolds's claim is procedurally barred because it could have been but was not raised at trial or on appeal. Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P. Thus, before Reynolds may be granted relief on his Brady/Giglio claim, he must present evidence both disproving those grounds of preclusion and proving his Bradyem>/Giglio claim by a preponderance of the evidence. Rule 32.3, Ala. R.Crim. P.
Accordingly, this cause is remanded to the circuit court with instructions that it to conduct further proceedings on Reynolds's Brady/Giglio claim.[1] The circuit court may order any discovery relating to this claim that it deems necessary to allow the parties to litigate Reynolds's claim. It must, however, provide Reynolds an opportunity to disprove the procedural bars asserted by the State and to prove his Brady/Giglio claim, and it must to provide the State an opportunity to present evidence in rebuttal. The circuit court may comply with this Court's remand instructions by conducting an evidentiary hearing or by taking evidence in the form of evidentiary submissions. Rule 32.9, Ala.R.Crim.P. Further, the circuit court shall make specific findings of fact regarding its disposal of Reynolds's claim.
Further, the circuit court is instructed to take all necessary action to see that the circuit clerk makes due return to this Court at the earliest time possible and within 56 days of the release of this opinion. The return to remand shall include the circuit court's written findings along with a transcript of the evidentiary hearing, if any, and all evidence taken by the court.
REMANDED WITH INSTRUCTIONS.
*203 *
WELCH, KELLUM, BURKE, and JOINER, JJ., concur.

Reynolds raised multiple issues on appeal. This Court pretermits discussion of those issues.

Note from the reporter of decisions: On April 22, 2016, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On January 27, 2017, that court denied rehearing, without opinion. On April 21, 2017, the Supreme Court denied certiorari review, without opinion (1160364).