[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-14015

_____

MICHAEL WAYNE REYNOLDS,

Petitioner-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:18-cv-00236-RDP

_____

Before JORDAN, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Michael Wayne Reynolds was sentenced to death in 2007 after he was found guilty on five counts of capital murder. Since the conclusion of his direct-appeal proceedings, he has unsuccessfully sought post-conviction relief in the state and federal courts.

We granted Mr. Reynolds a certificate of appealability to determine three issues: (1) whether the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), and/or *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny with respect to the testimony of Adrian Marcella West; (2) whether the district court properly denied the *Brady/Giglio* claims without discovery or an evidentiary hearing; and (3) whether counsel rendered ineffective assistance by failing to secure the admission of Chad Martin's confession to the murders.

After a review of the record, and with the benefit of oral argument, we affirm the district court's denial of habeas corpus relief. We also affirm the district court's denial of the requests for discovery and an evidentiary hearing.

## I

In October of 2007, an Alabama jury found Mr. Reynolds guilty on five counts of capital murder. The jury recommended, by a vote of 12-0, that Mr. Reynolds be sentenced to death. The trial court accepted the jury's recommendation and sentenced Mr. Reynolds to death.

**A**

The facts underlying Mr. Reynolds' conviction were described in detail by the Alabama Court of Criminal Appeals (ACCA) on direct appeal. *See Reynolds v. State*, 114 So. 3d 61, 74–81 (Ala. Crim. App. 2010). We provide a summary below.

During the early morning hours of Sunday, May 25, 2003, Charles Martin III, his wife, Melinda Martin, and their 8–year–old daughter, Savannah Martin, were murdered in their home. All three of them were stabbed, doused in gasoline, and set on fire. [1]

The murders were discovered later that morning when Mrs. Martin's father, Jerry Veal, drove by the Martin home. He noticed that Mrs. Martin's car was in the driveway at a time during which he expected his daughter to be at church. Mr. Veal called Mrs. Martin and received no response. Concerned, he drove back to the Martin home. He knocked on the carport door, but no one answered. Mr. Veal then opened the door, discovered that the kitchen was in disarray, and saw Mr. Martin lying there in a pool of blood. Mr. Veal returned outside and told his wife, who had been waiting in the car, what he had seen. Mr. Veal's wife called 911.

While Mr. Veal was on the phone with a 911 dispatcher, he saw James Mulkey, a retired police officer, drive by the home. Mr. Veal, who knew Mr. Mulkey, flagged him down and told him what he had seen in the Martin home.

---

[1] In the remainder of the opinion, we refer to Charles Martin III as Mr. Martin; to Melinda Martin as Mrs. Martin; and to Savannah Martin as Savannah.

Mr. Mulkey then went to the carport, opened the door, and saw Mr. Martin laying on the kitchen floor.  Mr. Mulkey did not go into the home at that time because he could smell gasoline and gunpowder.  Paramedics arrived shortly thereafter and went inside with Mr. Mulkey.  They discovered the bodies of Mrs. Martin and her daughter in one of the bedrooms.  Mrs. Martin was found on the floor of the bedroom with slits in her clothing that were consistent with stab wounds.  Savannah was found on the bed with stab wounds.

Investigators then arrived and processed the scene.  While doing so, they found a bloody footprint and a blood drop outside the carport door.  They also discovered three bloody shoe prints (one of which matched Mr. Reynolds) on the kitchen floor, as well as blood droplets in the hallway.  In the kitchen they noticed a utensil drawer open with blood underneath.

The investigators also found a phone cord that extended from the wall by the bed in the room where Mrs. Martin was found, but no telephone was attached to the cord.  The bedding in the room where Mrs. Martin and Savannah were found was removed from the scene.  Later that day, when the bedding was laid out to dry, a television remote and what appeared to be a piece from a pair of glasses fell out.

All three members of the Martin family were found to have stab wounds.  They also each had chemical burns.

**B**

The police interviewed and questioned several people after the murders were discovered, including Chad Martin, who was Mr. Martin's nephew, and John Langley, a friend of Chad Martin who lived in the same neighborhood as the Martins.

Chad Martin provided three different statements about his knowledge of and involvement in the murders.

In his first statement, Chad Martin denied having any involvement in the murders. This denial was reduced to writing and signed by Chad Martin.

In his second statement, however, Chad Martin confessed to being involved in and committing one of the murders. He told the police that he and two friends, Mr. Langley and John Zook, had killed the Martins. According to Chad Martin, the group had gone to the Martin home to obtain drugs from Mr. Martin. Mr. Zook stabbed Mr. Martin after he refused to give them any drugs. Mr. Langley then followed Mrs. Martin into the hallway, where he stabbed her. Afterwards, Mr. Langley asked Chad Martin to kill Savannah. According to Chad Martin, Savannah "looked at [him] with those big brown eyes wide open" before he stabbed her. Chad Martin also said that he became overwhelmed with emotion after he stabbed Savannah and kept asking aloud "Why did he make me stab her?" and "Why did he make me stick that little girl in the neck?" Chad Martin then got gasoline from Mr. Langley's car, and he doused Mr. and Mrs. Martin with it. He also poured some gasoline around the kitchen.

6                    Opinion of the Court                    22-14015

This confession was not memorialized in an official statement signed by Chad Martin. It was, however, detailed in two police reports. One report, dated May 25, 2003, was prepared by Sergeant Dale Fincher. The other report, dated May 29, 2003, was signed by Captain Roy Harbin.

Several days later, however, Chad Martin returned to the police station with an attorney and recanted his confession. He provided a statement that was consistent with his initial denial of any involvement in the murders. According to Chad Martin, the police had questioned him for about 18 hours, and he confessed to the murders after he decided to "tell them anything" so he could "get out of there."

## C

Adrian Marcella West, Mr. Reynolds' girlfriend at the time of the murders, provided an account at trial of her involvement, and that of Mr. Reynolds, in the murders. According to Ms. West, Mr. Reynolds was responsible for the murders.

Ms. West testified that, either late at night on May 24, 2003, or very early on the morning of May 25, 2003, she drove Mr. Reynolds to the Martin home in a car that belonged to Sandra Roberts, the girlfriend of Mr. Reynolds' father (Harold Reynolds). Mr. Reynolds lived with his father at the time of the murders. Mr. Reynolds told Ms. West that they were going to the Martin home "to get some money." *Reynolds*, 114 So. 3d at 74. Mr. Reynolds and Mr. Martin were acquainted and had been for some years.

At the Martin home, Ms. West parked in the driveway, where she stayed while Mr. Reynolds went inside. Mr. Reynolds was not wearing shoes and entered the home with a scabbard that held a dagger-style knife. Ms. West had seen the knife before at Harold Reynolds' home.

Mr. Martin opened the door to let Mr. Reynolds in. He also waved at Ms. West. Some moments later, Ms. West heard Mrs. Martin scream, and that caused her to run into the home. There, she saw Mr. Martin lying on the kitchen floor. She also heard Mrs. Martin scream again from the back of the house. Ms. West then went towards the bedroom. She saw Mr. Reynolds stabbing Mrs. Martin, who was bent over the bed.

Ms. West explained that Mr. Reynolds accidentally stabbed her when she tried to intervene and stop him from continuing to stab Mrs. Martin. Mr. Reynolds screamed at her and told her to take the telephone in the home and Mrs. Martin's purse and return to the car to wait for him. He also handed her two knives she had not seen before.

Doing as she was told, Ms. West grabbed the purse, the telephone, and the knives and left the bedroom. Before exiting, she saw that Mrs. Martin was slouched over and that Savannah was standing on the bed. Ms. West felt faint on her way out and leaned on the wall in the hallway, and also against the kitchen counter. Ms. West placed the items she removed from the home on the floorboard of the front passenger seat in the car.

At some point, Mr. Reynolds returned to the car, grabbed one of the knives Ms. West had left with, and went back into the home. Mr. Reynolds then came back to the car, instructed Ms. West not to leave, and then returned once again to the home. Ms. West said that she followed Mr. Reynolds' command because she feared for her life.

Mr. Reynolds returned to the car a third and final time. He got into the car and told Ms. West, who did not realize that she had been hurt, that she had been stabbed. He also said he should be the one to drive them back. Ms. West refused and drove back to Harold Reynolds' home. Ms. West said she could see the orange glow of a fire at the Martin home before they left.

When they arrived, Mr. Reynolds took the clothes from Ms. West and told her to take a shower. Mr. Reynolds also later bandaged her arm. He told her that he had cleaned Sandra Roberts' car and that there was no blood in the car.

Ms. West explained that when she and Mr. Reynolds woke up the next morning, she noticed that the pair of glasses Mr. Reynolds had been wearing the day before were broken and missing a piece. When she told Mr. Reynolds, he said that the missing piece would melt in the fire at the Martin home. Mr. Reynolds also told her that the knives from the previous night were under a truck, and

that the clothes they had been wearing that night were in a white bag.[2]

On the morning of May 25, 2003, the day the murders were discovered, a man named Donald Harvey came to Harold Reynolds' home to ask Mr. Reynolds to install a radio in his car. Mr. Reynolds obliged and Mr. Harvey paid him with cocaine.

After this exchange, Ms. West saw Mr. Harvey drive into an alley behind Harold Reynolds' home. She went into his car, and Mr. Harvey asked her if Mr. Reynolds was involved in the murders of the Martins. Ms. West confirmed that he was. She and Mr. Harvey both agreed to destroy evidence of Ms. West's involvement in the crimes. To that end, they purchased gas and drove to a place in the woods. There they burned the clothes that Ms. West and Mr. Reynolds had been wearing at the Martin home. Then they threw the knives into a river and the telephone base into the woods.

A few days later, Ms. West told a former employer, who happened to be an attorney, what she knew about the murders. The former employer contacted the district attorney's office, which then took Ms. West's statement. With the information Ms. West provided, the police located the burn pile of the clothes she and Mr. Reynolds wore on the day of the murders. They also

---

[2] At trial, the prosecution introduced the piece from Mr. Reynolds' glasses, which was found at the Martin home. The piece had Mrs. Martin's DNA on it.

found a telephone base, which was established at trial to have been removed from the Martin home.

## D

Sandra Roberts, Harold Reynolds' girlfriend at the time, also testified at trial. Ms. Roberts explained that she was asleep at Harold Reynolds' home when Ms. West and Mr. Reynolds returned during the early hours of Sunday, May 25, 2003. She was awakened when Mr. Reynolds placed the keys to her car on a nightstand. She got out of bed shortly after that and went into the kitchen, where Mr. Reynolds joined her and gave her money to buy some drugs. Ms. Roberts left to purchase crack cocaine.

Ms. Roberts and Mr. Reynolds divided the crack cocaine when she returned. She ingested her portion while Mr. Reynolds took some to his bedroom. According to Ms. Roberts, Mr. Reynolds returned shortly and asked her to have sex, but she refused. She also testified that he wanted more drugs but said that Ms. West would not give him any more money. Mr. Reynolds asked Ms. Roberts to speak to Ms. West to see if she would give them the money. According to Ms. Roberts, Ms. West acted strangely and was unable to hold a conversation. She also testified that she observed Ms. West walking with her arms folded.

Ms. Roberts decided to return to her own home shortly after her interactions with Ms. West and Mr. Reynolds. On her drive home, she noticed a cordless telephone, which she had not seen before, on the floorboard of her car.

## E

Mr. Reynolds testified at trial and provided a different version of events. According to Mr. Reynolds, he and Ms. West used drugs, including crack cocaine, with Ms. Roberts during the day on May 24, 2003, and then again later that evening. He then sent Ms. West and Ms. Roberts to obtain more drugs while he stayed home and eventually fell asleep. Sometime after midnight, he was awoken by Ms. West, who told him that the Martins had been murdered, and that she had been stabbed when she tried to stop someone from stabbing Mrs. Martin. Mr. Reynolds asked Ms. West who had stabbed her, but she would not say who. He then grabbed a first aid kit and went outside with Ms. West barefoot so that his father would not hear them. He also tended to her stab wound. At her insistence, she drove them both to the Martin home to remove all evidence that she had been there during the murders.

When they arrived, Mr. Reynolds asked Ms. West to remain in the car while he went into the home barefoot. Inside, he saw Mr. Martin lying on the floor with blood around him. He then went into the bedroom to check on Mrs. Martin because Ms. West had told him that she was stabbed in the bedroom. He did not see Mrs. Martin until he tripped over her body and fell. When he fell, his glasses came off. Mrs. Martin, according to Mr. Reynolds, was lodged between the door and the bed.

Mr. Reynolds then went back to Ms. West in the car and asked her what she had touched in the Martin home. Ms. West could not remember specifically what she had touched, so Mr.

Reynolds went back into the home to wipe down any trace of Ms. West having been there. But he did not know "where to begin" because everything "was a mess." So he decided to "burn the house down." He grabbed a "gas jug" he had seen by the side door, doused the house, lit it on fire, and went back to Ms. West in the car outside. They then drove back to Harold Reynolds' home. Mr. Reynolds testified that he rewrapped Ms. West's arm when they arrived there.

After they returned, he gave Ms. Roberts $10 to buy them drugs. Ms. Roberts left and returned about five minutes later with "dope." Mr. Reynolds and Ms. Roberts did some "dope" together in the kitchen and then he took some back to Ms. West, who was in the bedroom. Ms. West did not want any drugs, so he went back to the kitchen and ingested the rest of the drugs. He then fell asleep and did not wake up until later that morning. He said that later that day he tried to get Ms. West to tell him what had happened at the Martin home, but she refused to say anything more.

## F

Based on her conduct, Ms. West was charged with unlawful distribution of a controlled substance and first-degree hindering prosecution. A year before the murders, on August 6, 2002, Ms. West had also been arrested for unlawful distribution of a controlled substance, second-degree unlawful possession of marijuana, and unlawful possession of drug paraphernalia.

Ms. West pled not guilty to both sets of charges. Her trials were continued a handful of times. After her testimony in Mr.

Reynolds' trial, Ms. West pled guilty, in a blind plea, to the charges of distribution of a controlled substance and hindering prosecution. The remaining charges were dropped. Ms. West was sentenced to three years in prison, but she was released after serving only six months following a recommendation filed by the prosecution.[3]

## G

Before trial, while the parties discussed logistics, Mr. Reynolds' counsel told the trial court that the defense had subpoenaed Sergeant Fincher, who had signed one of the reports that memorialized Chad Martin's confession to the murders, but had not received a response. Sergeant Fincher no longer lived in Alabama at the time of trial. Counsel also told the trial court that Sergeant Fincher was not considered a "critical" witness. Sergeant Fincher did not testify at trial.

At trial, Mr. Reynolds' counsel tried to introduce Chad Martin's confession through Captain Harbin, who had signed the second report containing Chad Martin's confession. Captain Harbin, however, could not authenticate the report because he said he had not prepared the report and had not been present for the entirety of Chad Martin's statement. Captain Harbin also testified that the report was not consistent with his recollection of Chad Martin's statement. As a result, the trial court did not allow the report to be admitted at trial. The trial court, however, clarified that it was only ruling that the report itself was not admissible, but that the defense

---

[3] We discuss Ms. West's plea and sentence in more detail later.

could ask Captain Harbin any questions without limitation on the subject matter. Mr. Reynolds' counsel, however, moved on to the next witness.[4]

## H

At the conclusion of the trial, the jury found Mr. Reynolds guilty of five counts of capital murder. The five murder charges were made capital because: (1) two or more persons were killed by one act or pursuant to one scheme or course of conduct (Count I of the indictment); (2) the murder of Mr. Martin was committed during the course of a first-degree robbery (Count II of the indictment); (3) the murder of Mrs. Martin was committed during the course of a first-degree robbery (Count III of the indictment); (4) Savannah was less than 14 years of age when she was murdered (Count IV of the indictment); and (5) the murder of Savannah was committed during the course of a first-degree robbery (Count V of the indictment).

The jury also recommended, by a vote of 12-0, that Mr. Reynolds be sentenced to death. The trial court accepted the jury's recommendation and sentenced Mr. Reynolds to death.

Mr. Reynolds appealed his conviction and sentence to the ACCA, which affirmed. *See Reynolds*, 114 So. 3d at 162. He filed a petition for certiorari with the Alabama Supreme Court, but that

---

[4] Mr. Reynolds' counsel was also unable to introduce the confession through Chad Martin. Though he testified at trial, Chad Martin said he did not recall the details of the statement that included his confession.

petition was denied.  His petition for a writ of certiorari with the United States Supreme Court was also denied.

### III

Mr. Reynolds timely sought post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, asserting numerous claims.  As relevant here, he alleged that (i) the prosecution failed to comply with its obligations under *Brady* and/or *Giglio* by failing to disclose that it had an agreement with Ms. West in exchange for her testimony at Mr. Reynolds' trial; and that (ii) he was denied effective assistance of counsel in violation of the Sixth Amendment due to his counsel's failure to introduce Chad Martin's confession.

The Rule 32 court summarily denied Mr. Reynolds' petition. On appeal, the ACCA remanded the matter back to the Rule 32 court on the *Brady/Giglio* claims.  *See Reynolds v. State*, 236 So. 3d 189, 202 (Ala. Crim. App. 2015).  The ACCA instructed the Rule 32 court to give Mr. Reynolds the opportunity to challenge the procedural bars the state asserted and to prove his *Brady/Giglio* claims, and to permit the state to present its own evidence in rebuttal.  *See id.*  Importantly, the ACCA explained that the Rule 32 court could comply with its instructions by either holding an evidentiary hearing or by receiving evidence in the form of evidentiary submissions in document form.  *See id.*

On remand, the Rule 32 court issued a scheduling order that included a deadline for both parties to present evidentiary submissions on Mr. Reynolds' *Brady/Giglio* claims.  Days after the issuance

of the scheduling order, Mr. Reynolds filed an initial discovery motion. The state opposed the motion, arguing that Mr. Reynolds had failed to establish good cause for his "overly broad" discovery requests. The Rule 32 court agreed with the state's response, and denied the motion.

Mr. Reynolds subsequently filed a motion asking for a 30-day extension to present his evidentiary submissions. He also asked the Rule 32 court to reconsider its ruling denying the motion for discovery. The Rule 32 court denied the motion for an extension but granted, in part, the motion to reconsider its denial of the motion for discovery. In partially granting the motion to reconsider, the Rule 32 court ordered the state to provide Mr. Reynolds "any and all files . . . pertaining to the prosecution of Adrian Marcella West for hindering prosecution, unlawful distribution of a controlled substance, possession of a controlled substance and/or drug paraphernalia."

After both parties filed their respective evidentiary submissions, the Rule 32 court denied Mr. Reynolds' request for relief on his *Brady/Giglio* claims. The Rule 32 court found that Mr. Reynolds' allegation of an agreement between Ms. West and the prosecution was unfounded because nothing in the record indicated such an agreement existed. The Rule 32 court noted that, on at least two occasions, Ms. West denied the existence of an agreement while testifying under oath. The Rule 32 court also explained that Ms. West, Ms. West's attorney, and the Chief Deputy District Attorney all averred in sworn statements that there was no

agreement. Accordingly, the Rule 32 court concluded that Mr. Reynolds had failed to meet his burden of proof on his *Brady/Giglio* claims.

The case was returned to the ACCA, which affirmed the Rule 32 court's decision. The ACCA explained that the Rule 32 court's order was supported by the record. The ACCA also stated that "the claims were insufficiently plead under Rules 32.3 and 32.6(b), [ ] were without merit, or were procedurally barred."

The ACCA also affirmed the dismissal of Mr. Reynolds' claims of ineffective assistance of counsel. With respect to counsel's failure to introduce Chad Martin's confession, the ACCA held that Mr. Reynolds had not pled facts sufficient to make a showing of a Sixth Amendment violation pursuant to *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The ACCA observed that though Mr. Reynolds argued that there were other people who could have authenticated the report containing the confession, he failed to plead facts "that would indicate that they could, in fact, do so." "More importantly," the ACCA stated, "[Mr.] Reynolds failed to plead how Chad Martin's confession was consistent with the defense's theory of the case," given that his strategy at trial was to limit his role to helping Ms. West cover her own involvement in the murders.

The Alabama Supreme Court denied certiorari review. Mr. Reynolds subsequently filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Mr. Reynolds raised numerous claims, including claims that the prosecution had

violated its *Brady*/*Giglio* obligations and that he had been denied the effective assistance of counsel. Mr. Reynolds also sought discovery and an evidentiary hearing on his claims.

The district court denied the § 2254 petition, concluding that Mr. Reynolds had not met his burden of showing that he was entitled to relief on any of his claims. The district court also denied the requests for discovery and for an evidentiary hearing because Mr. Reynolds had not shown that either was warranted. The district court also declined to issue a certificate of appealability.

Mr. Reynolds sought our review of the district court's denial. We issued a certificate of appealability to address three issues: (1) whether the prosecution violated *Brady* and/or *Giglio* and their progeny with respect to the testimony of Ms. West; (2) whether the *Brady*/*Giglio* claims were properly denied without discovery and an evidentiary hearing; and (3) whether counsel rendered ineffective assistance by failing to secure the admission of Chad Martin's confession. We address each of these issues in turn.

## IV

We review a district court's denial of a habeas corpus petition under 28 U.S.C. § 2254 *de novo*. *See Sims v. Singletary*, 155 F.3d 1297, 1304 (11th Cir. 1998). Because Mr. Reynolds filed his petition after April 24, 1996, however, this appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which "establishes a highly deferential standard for reviewing state court judgments." *Parker v. Sec'y, Dep't. of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003). Pursuant to AEDPA, a federal court may grant a writ

of habeas corpus only if the state court's determination of a federal claim was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's determination is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's determination is "an unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. Reasonableness is an objective standard, and a federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that the state court was incorrect. *See id*. at 410. *See also Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n unreasonable application . . . must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (citation and internal quotation marks omitted).

Under § 2254(d)(2), we presume that a state court's factual findings are correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Pye v. Warden*, 50 F.4th 1025, 1034–35 (11th Cir. 2022) (en banc). "This deference requires that a

20                    Opinion of the Court                    22-14015

federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record." *Rose v. McNeil*, 634 F.3d 1224, 1241 (11th Cir. 2011) (citations omitted).

In addition, our review of the evidence is limited to what the parties presented at the trial, the direct appeal, and the Rule 32 proceeding. *See Shinn v. Ramirez*, 596 U.S. 366, 378 (2022) (a federal habeas court's review of a state court judgment is "highly circumscribed" and is "based solely on the state-court record.").

## V

Mr. Reynolds asserts that the prosecution violated its *Brady* and *Giglio* obligations in two ways: (1) by failing to disclose that it struck a deal with Ms. West in exchange for her testimony at his trial; and (2) by failing to correct Ms. West's testimony at trial that there was no agreement.

## A

Although related, *Brady* and *Giglio* claims are distinct and require different showings.

To establish a *Brady* violation, a defendant must prove that (1) the evidence was favorable to him, either because it is exculpatory or impeaching; (2) the prosecution suppressed the evidence, either willfully or inadvertently; and (3) the evidence suppressed was material (i.e., that there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would

have been different). *See Turner v. United States*, 582 U.S. 313, 323 (2017); *Banks v. Dretke*, 540 U.S. 668, 691 (2004). To establish a *Giglio* violation, on the other hand, the defendant must prove that "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material i.e., that there is any reasonable likelihood that the false testimony could . . . have affected the judgment." *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008) (quotation marks omitted).

The gravamen of Mr. Reynolds' *Brady/Giglio* claims is that the timing and outcome of Ms. West's own criminal cases lead to the conclusion that she assisted the prosecution by testifying against Mr. Reynolds in exchange for a lenient sentence for her own (and significant) criminal charges. According to Mr. Reynolds, Ms. West was facing up to a total of 60 years in prison for her charged offenses, but served less than a year in custody after the prosecution recommended leniency. Mr. Reynolds also points to the delay in Ms. West's cases and asserts that the cases were inexplicably postponed until after Mr. Reynolds' trial and conviction.

Under AEDPA, Mr. Reynolds is entitled to relief only if he can establish that the ACCA's decision on these claims was unreasonable. The question for us is not whether we would have reached a different conclusion, but whether the determination by the ACCA was objectively unreasonable.

The Rule 32 court found, as a matter of fact, that "nothing in the record . . . indicate[d] there was an agreement between the prosecution and [Ms.] West." In making this finding, the Rule 32

court noted that, in the months preceding Mr. Reynolds' trial, the trial court ordered the prosecution to provide all its files on the case—including any incentives provided to or agreements made with witnesses.  The trial court also granted Mr. Reynolds access to all files he needed to ensure a fair trial, and any files that were not provided to Mr. Reynolds were reviewed *in camera* by the trial court.

The Rule 32 court based its finding that there was no agreement on the following subsidiary facts: (1) Ms. West denied the existence of an agreement on the stand at trial on at least two occasions; (2) her attorney, in a sworn statement, denied knowledge of any agreement; and (3) the Chief Deputy District Attorney, Marcus Reid, also in a sworn statement, denied the existence of an agreement.

As further support for its finding, the Rule 32 court reasoned that Ms. West's sentence was consistent with those of offenders in similar circumstances.  Although Mr. Harvey received a harsher sentence for hindering prosecution, he was a habitual offender known to the courts.

In sum, the Rule 32 court found that Mr. Reynolds had not, despite being provided the opportunity to do so, shown "by a preponderance of the evidence or any other legal standard" the existence of an agreement between the prosecution and Ms. West.  The Rule 32 court said that Mr. Reynolds' *Brady/Giglio* claims were based on "speculation and conjecture."

Mr. Reynolds appealed to the ACCA.  But the ACCA affirmed the Rule 32 court's findings and rulings, concluding that they were supported by the record.

## B

Mr. Reynolds' *Brady/Giglio* claims depend on the existence of an agreement between the prosecution and Ms. West.  If there was no such agreement, the prosecution did not violate *Brady* (because nothing was withheld from the defense), or *Giglio* (because Ms. West did not provide false testimony that needed to be corrected).

A determination that there was no agreement between the prosecution and a defendant is a finding of fact.  *See, e.g., United States v. Butler*, 297 F.3d 505, 513 (6th Cir. 2002).  And the Rule 32 court found that there was no agreement between the prosecution and Ms. West.  As a result, Mr. Reynolds must show that the Rule 32 court's factual finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  He must demonstrate that the finding "lacked even fair support in the record."  *Rose*, 634 F.3d at 1241.

This he has not done.  Although factual inferences can be drawn in the way Mr. Reynolds suggests, the record can also be read differently.  As described above, the Rule 32 court's finding that there was no agreement was based on first-hand evidence, including sworn statements by those with personal knowledge of the situation attesting that there was no agreement, as well as its

determination that Ms. West was sentenced in a manner similar to individuals with similar criminal charges and histories.

We are not the original triers of fact and our review of the state court factual findings is deferential under AEDPA. Our limited review means that we may not issue a writ of habeas corpus simply because we conclude, in our independent judgment, that the Rule 32 court and the ACCA were incorrect. *See Williams*, 529 U.S. at 410. The decision must be objectively unreasonable.

On the record here, we cannot say that the Rule 32 court's finding that there was no agreement between Ms. West and the prosecution was an unreasonable determination of the facts. *See* § 2254(d)(2); *Pye*, 50 F.4th at 1034–35; *Rose*, 634 F.3d at 1241. Because "'fairminded jurists could disagree' on the correctness of the state court's decision," Mr. Reynolds is not entitled to relief on his *Brady/Giglio* claims. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## VI

We also granted Mr. Reynolds a certificate of appealability to determine whether the district court erred in denying his *Brady/Giglio* claims without granting him discovery or conducting an evidentiary hearing. We review a district court's denial of a habeas petitioner's request for discovery for abuse of discretion. *See Bracy v. Gramley*, 520 U.S. 899, 909 (1997). We also review a district court's refusal to hold an evidentiary hearing for abuse of discretion. *See Pugh v. Smith*, 465 F.3d 1295, 1298, 1300 (11th Cir. 2006). Upon review, we conclude that the district court's denials of the

requests for discovery and an evidentiary hearing were not an abuse of discretion.

A habeas petitioner is generally "not entitled to discovery as a matter of ordinary course," but he may be granted leave to conduct discovery upon a showing of "good cause," *Bracy*, 520 U.S. at 908–09, to believe that the evidence sought would "raise[ ] sufficient doubt about [his] guilt to undermine confidence in the result of the trial." *Arthur v. Allen*, 459 F.3d 1310, 1310 (11th Cir. 2006) (per curiam) (quoting *Schlup v. Delo*, 513 U.S. 298, 317 (1995)). Good cause is shown "where specific allegations . . . show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he . . . is entitled to relief." *Bracy*, 520 U.S. at 908–09. "[G]ood cause for discovery cannot arise from mere speculation" or "pure hypothesis." *Arthur*, 459 F.3d at 1311. *See Borden v. Allen*, 646 F.3d 785, 810 n.31 (11th Cir. 2011) ("[A] habeas case is not a vehicle for a so-called fishing expedition via discovery, an effort to find evidence to support a claim.").

The district court denied the requests for discovery and an evidentiary hearing because it concluded that Mr. Reynolds had not sufficiently articulated what additional discovery would reveal. The abuse of discretion standard gives the district court a "range of choice" and that means that there are times when we will affirm even though we might have ruled the other way had it been our call in the first instance. *See In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994). This is one of those cases. Given the denials of an agreement by those who would have had first-hand knowledge, the

denials of discovery and an evidentiary hearing were not a "clear error of judgment." *Id.*

## VII

We now turn to Mr. Reynolds' claim of ineffective assistance of counsel.

## A

The Sixth Amendment entitles criminal defendants to the "effective assistance of counsel"—that is, representation that does not fall "below an objective standard of reasonableness" relative to "prevailing professional norms." *Strickland*, 466 U.S. at 686–88. That standard is necessarily flexible, as "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688−89. The relevant question is whether counsel's conduct was "outside the wide range of professionally competent assistance." *Id.* at 690. To prevail on his ineffective assistance of counsel claim, Mr. Reynolds must demonstrate both (1) that his "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To overcome this presumption on the performance prong, Mr. Reynolds must

demonstrate that "no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

The prejudice prong of a *Strickland* claim is satisfied when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is one that is "sufficient to undermine confidence [in the sentence]," and does not require a showing that "counsel's deficient conduct more likely than not altered the outcome of [the petitioner's] penalty proceeding." *Porter v. McCollum*, 558 U.S. 30, 44 (2005) (quoting *Strickland*, 466 U.S. at 693–94). Nevertheless, the likelihood of a "different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 111–12. *See also Thornell v. Jones*, 144 S. Ct. 1302, 1310 (2024) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result. This standard does not require a defendant to show that it is more likely than not that adequate representation would have led to a better result, but the difference should matter only in the rarest case.") (citations and internal quotation marks omitted).

**B**

Mr. Reynolds argues that his counsel rendered deficient performance by failing to introduce Chad Martin's confession at the trial and at his penalty phase. According to Mr. Reynolds, his counsel "made only an abortive attempt" to secure Sergeant Fincher's

presence at trial.  *See* Appellant's Br. at 74.  Mr. Reynolds also contends that his counsel failed to interview Captain Harbin before trial, which would have revealed that he could not authenticate the report detailing the confession before the trial.  It was unreasonable, Mr. Reynolds argues, for counsel to have failed to find someone else who could have authenticated the report or otherwise testified about Chad Martin's confession.  *See id.* at 75.  Mr. Reynolds asserts that he was prejudiced by these deficiencies because Chad Martin's confession was inconsistent with Ms. West's testimony, and without the confession, "the jury was left with [Ms.] West's testimony that [he] was the perpetrator, over [his] denials." *Id.* at 83.

The Rule 32 court dismissed this claim as insufficiently pled.  Mr. Reynolds appealed and the ACCA affirmed this dismissal.  In doing so, the ACCA agreed that Mr. Reynolds' ineffective assistance of counsel claim was insufficiently pled.  The ACCA explained that Mr. Reynolds was repeating the alleged mistake that his counsel made—assuming that any of the officers present for some portion of Chad Martin's confession could authenticate the report containing the confession.

The ACCA also reasoned that Mr. Reynolds had not explained "how Chad Martin's confession would have been consistent with the defense's theory of the case."  This was so because, according to Mr. Reynolds, he cleaned the Martin home after the murders, got the gas from outside the home, and set the home on fire in order to assist Ms. West.  Chad Martin, however, testified that he was the one responsible for dousing the home.  For all these

reasons, the ACCA alternatively concluded that Mr. Reynolds failed to establish that he was prejudiced by his counsel's failure to introduce Chad Martin's confession—both at the guilt and penalty phases of his trial.

We "may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied." *Waters v. Thomas*, 46 F.3d 1506, 1510 (11th Cir. 1995) (en banc). The Supreme Court has explained that "there is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. *See, e.g., Frazier v. Bouchard*, 661 F.3d 519, 532 (11th Cir. 2011) (declining to analyze the performance prong where the petitioner "[could not] make the requisite showing of prejudice under *Strickland*'s second prong"). Because we conclude that Mr. Reynolds cannot satisfy the prejudice prong, we need not and do not examine whether his counsel's performance was deficient.

We set out the standard for the prejudice prong of *Strickland* earlier, and do not repeat it here. But we note that, as a federal court conducting habeas review under AEDPA, the question is not whether Mr. Reynolds has shown prejudice under *Strickland*. It is, instead, whether a fair-minded jurist could agree with the no-prejudice determination of the ACCA. *See Shinn v. Kayer*, 592 U.S. 111, 121 (2020) (explaining that the "question is whether a fairminded jurist could take a different view" than the one advanced by the habeas petitioner). *See also id.* at 124 (a federal court cannot grant habeas relief unless the state court's determination was "so

obviously wrong as to be 'beyond any possibility for fairminded disagreement'") (citation omitted).

Applying AEDPA deference, we conclude that the ACCA's ruling as to prejudice was reasonable.

First, the jury heard some of the details of Chad Martin's confession. During her testimony at trial, Lieutenant Faye Gary testified that Chad Martin appeared to know where the Martins' bodies were in the home. Lieutenant Gary also told the jury that Chad Martin made comments about smelling gasoline, losing his sunglasses in the Martin home, and hearing Savannah say "don't hurt me."

Second, as the ACCA observed, Chad Martin's confession was inconsistent with Mr. Reynolds' defense theory and testimony at trial. According to his confession, Chad Martin had gotten the gas out of the trunk of one of his friend's car, and then poured the gas on Mrs. Martin and around the home. At trial, Mr. Reynolds testified that he was at the Martin home only to help Ms. West cover her tracks. He also testified—contrary to what Chad Martin had confessed to—that he was the one who got gas from a can located beside the porch steps, doused the rooms, and set the home ablaze. Given Mr. Reynolds' own testimony, this was not a case in which the defense could have put up a lot of different factual scenarios in an effort to create reasonable doubt as to the prosecution's theory.

Third, the jury was not, as Mr. Reynolds posits in his brief, left with just Ms. West's testimony about the murders. Other

evidence at trial included the following: (1) a piece of Mr. Reynolds' prescription glasses was found at the crime scene with Mrs. Martin's DNA on it; (2) the other parts of the same glasses were found in Mr. Reynolds' room at his father's house; (3) a bloody footprint at the crime scene matched Mr. Reynolds footprint; and (4) the blood of both Mrs. Martin and Mr. Reynolds were on the handle of the gasoline can.

Accordingly, we conclude that the ACCA's determination that Mr. Reynolds had not established prejudice under *Strickland* was reasonable.

## VIII

The district court's denial of Mr. Reynolds' habeas corpus petition is affirmed.

**AFFIRMED.**

22-14015                JORDAN, J., Concurring                1

JORDAN, Circuit Judge, Concurring.

I join the court's opinion with these additional thoughts.

Mr. Reynolds contends that the Rule 32 court unreasonably found that no agreement existed between the prosecution and Ms. West. Though the timing and circumstances surrounding the resolution of Ms. West's charges might seem suspicious, it cannot be said that the Rule 32 court's determination that no agreement existed is unreasonable.

On this record, the district court could have granted Mr. Reynolds some discovery and/or conducted an evidentiary hearing. Mr. Reynolds was denied the opportunity in the Rule 32 proceedings to depose Ms. West, her attorney, or the Chief Deputy District Attorney. An evidentiary hearing could have given Mr. Reynolds a chance to test for the first time, in an adversarial setting, the sworn declarations filed by the state in the Rule 32 proceedings. But our review of the district court's decision is deferential, and I agree that Mr. Reynolds has not shown an abuse of discretion.